Barry I. Levy, Esq.
Michael Vanunu, Esq.
Allison N. Stapleton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY, | Docket No.:_____ (      ) |
| Plaintiffs, | |
| -against- | **Plaintiff Demands a Trial by Jury** |
| SUSAN J. POLINO PH.D. (A Sole Proprietorship), SUSAN J. POLINO, DAVID CATACORA, MARIE COLETTE LEON, SAMERRA WELSH, ORLEIDA MATOS, SHERYL LOUIS AND JOHN DOE DEFENDANTS "1" THROUGH "10", | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"),

as and for their Complaint against Defendants, hereby alleges as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $790,000.00 that the Defendants have

wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of

fraudulent, unlawful and otherwise non-reimbursable no-fault insurance charges for purported psychology services, including diagnostic interviews, medical record reviews, psychological testing and psychotherapy (collectively, the "Fraudulent Services"), that purportedly were provided to individuals who claimed to have been involved in automobile accidents and eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $175,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Susan J. Polino, Ph.D. (A Sole Proprietorship) (hereinafter, referred to as "PSP") because:

(i)      the Fraudulent Services were allegedly provided by and billed through PSP, which is a healthcare "practice" not under the control and direction of Susan J. Polino. Rather, at all relevant times, PSP was operated, managed, and controlled by the John Doe Defendants (as defined below) for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

(ii)     the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements established between the Defendants and the Clinics (as defined below);

(iii)    the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent they were provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

(iv)     the billing codes used by the Defendants to seek payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

3.      Specifically, the fraudulent scheme can be described as follows:

(i)      Susan J. Polino (hereinafter referred to as "Polino") associated with John Doe Defendants "1" through "10" (hereinafter referred to as the "John Doe

Defendants") and allowed her name and professional license to be used by them to establish PSP and allowed the John Doe Defendants to secretly own, operate, manage and control PSP.

(ii)     Through unlawful financial arrangements, relationships were established with a large number of multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (hereinafter, the "Clinics");

(iii)    The John Doe Defendants arranged to have Polino enter into "funding" agreements with various companies, including a company known as Big Bridge Funding, LLC to provide for advances against the account receivables associated with the Fraudulent Services for the purposes of making the payments needed to fund the fraudulent scheme, including the unlawful financial relationships with the Clinics;

(iv)     Polino and the John Doe Defendants arranged to have the Fraudulent Services performed by individuals who were not employed by either Polino or PSP and many of whom were not licensed to render the Fraudulent Services in the first instance.  The Fraudulent Services were provided by social workers and other unlicensed individuals including David Catacora, Marie Colette Leon, Samerra Welsh, Orleida Matos, and Sheryl Louis (collectively, referred to hereinafter as the "Social Worker Defendants") at the Clinics, consisting of more than forty (40) separate locations during a period of less than four (4) months, and resulted in the generation of falsified reports regarding the scope of the services and the clinical findings; and

(v)      Polino and the John Doe Defendants used the falsified reports to submit bills through PSP seeking payment from GEICO and other New York automobile insurers for thousands of dollars per Insured per date of treatment.

4.      Once the pieces were in place, the John Doe Defendants: (i) used Polino's psychology license, electronic copies of her signature and the tax identification number of PSP to generate large volumes of false and fraudulent documents, including NF-3 forms (i.e. bills), assignment of benefit forms, and medical records; and (ii) used PSP as a fictional healthcare "practice" to serve as the billing vehicle through which millions of dollars of billing for the Fraudulent Services could be submitted to GEICO and other New York automobile insurers.

5.     Because PSP was nothing more than a shell to hide the participation of the John Doe Defendants in the scheme, it was equally critical to the success of the fraudulent scheme for Polino and the John Doe Defendants to partner with New York collection attorneys who were willing to:

(i)      purport to represent Polino and PSP;

(ii)     associate with the Funders and the John Doe Defendants in connection with the unlawful scheme;

(iii)    pursue payment and collection against GEICO and other New York automobile insurers by knowingly: (a) submitting fraudulent bills to the insurers for the Fraudulent Services; and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and

(iv)     accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to third-parties, including the John Doe Defendants.

6.     The John Doe Defendants used the information received from Polino to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including assignment of benefits ("AOBs") forms and other medical records; and (ii) the engagement letter and associated documents needed by the collection lawyers to bill and collect on the Fraudulent Services.  Thereafter, the John Doe Defendants provided the package of documents associated with billing, collection, and funding efforts to the collection lawyers and thereafter, began to transfer the fabricated claim documents to them.  Once the documents were processed by the collection lawyers into bills (i.e. "NF-3" forms) using the name of PSP, they organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment.

7.     Once the claims were compiled and submitted to GEICO, they were transferred/assigned to the funding companies as part as an effort to exercise total and exclusive

control over PSP and its only assets (i.e. the income stream from the claims). Once the documents were in place with the funding companies, money was transferred to the John Doe Defendants, disguised as "advances" against the claims for the Fraudulent Services. The John Doe Defendants were not signatories to the funding agreements, received the money without risk, and used the payments received from the Funders for their own benefit, as well as to pay individuals and entities to perpetuate the Defendants' fraudulent scheme.

8.     As set forth herein, the Defendants at all relevant times have known that:

(i)     the Defendants were not in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)    the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)   the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent they were provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    in many cases, the Fraudulent Services never were provided in the first instance;

(v)     the billing codes used by the Defendants to seek payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(vi)    the Fraudulent Services were provided, to the extent provided at all, (a) by unsupervised MSWs and other unlicensed persons, in contravention of New York law, and/or (b) individuals who were not employed by PSP

9.     As such, the Defendants are not and have never been eligible to be compensated for the bills they submitted to GEICO through PSP.

10. The chart annexed hereto as Exhibit "1" summarizes, in part, the fraudulent charges identified to date that the Defendants have submitted, or caused to be submitted, to GEICO, using the United States mails, using PSP.

11. The Defendants' fraudulent scheme began no later than 2021 and has continued uninterrupted since that time. The Defendants continue to pursue collection against GEICO on the Fraudulent Services through the prosecution of lawsuits and arbitrations.

12. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $790,000.00.

**THE PARTIES**

**I.       Plaintiffs**

13. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.      Defendants**

14. Defendant Polino resides in and is a citizen of New York. At all relevant times Polino was a registered clinical psychologist who purported to provide many of the Fraudulent Services that were billed to GEICO through PSP.

15. Defendants, David Catacora ("Catacora"), Marie Colette Leon ("Leon"), Samerra Welsch ("Welsch"), Orleida Matos ("Matos"), and Sheryl Louis ("Louis") reside in and are citizens of the State of New York. At all relevant times, Catacora, Leon, Welsch, Matos, and Louis were social workers and/or unlicensed persons who purported to provide many of the Fraudulent Services that were billed to GEICO through PSP.

16.     Matos is no stranger to these types of fraudulent no-fault insurance schemes.  She has been associated with several similar schemes since 2021 and is a defendant in a lawsuit currently pending in the Eastern District of New York (Docket No.: 1:22-cv-02860-ARR-MMH), involving a clinical psychologist by the name of Karin Gepp, whose license and sole proprietorship were wrongfully used to bill GEICO for more than $1.3 million during the same time period.   In addition, Matos, along with Welsch and Leon, were directly involved in a related scheme involving a clinical psychologist by the name of Dianna Bruno, whose identity, license and sole proprietorship were misappropriated by laypersons and wrongfully used to bill GEICO more than $1 million during the same time frame.

17.     John Doe Defendants "1" through "10" are citizens of New York. John Doe Defendants "1" through "10" are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with Polino, PSP and the Social Worker Defendants.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

19.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

20.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

22.     GEICO underwrites automobile insurance in New York.

**I.      An Overview of the Pertinent Law Governing No-Fault Reimbursement**

23.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

24.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

25.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

26.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

27.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

28.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

29.     In New York, only a licensed psychologist may: (i) practice psychology; (ii) own or control a psychology practice; (iii) employ and supervise other psychologists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

30.     Unlicensed non-psychologists may <u>not</u>: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

31.     New York law prohibits licensed healthcare services providers, including psychologists, from paying or accepting kickbacks in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

32.     New York law prohibits unlicensed persons not authorized to practice a profession, like psychology, from practicing the profession and from sharing in the fees for professional services. <u>See</u>, <u>e.g.</u>, New York Education Law § 6512, § 6530(11), and (19).

33.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or it allows unlicensed laypersons to share in the fees for the professional services.

34.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew

Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals

made clear that: (i) healthcare providers that fail to comply with material licensing requirements are

ineligible to collect No-Fault Benefits; and (ii) only licensed practitioners may practice their

profession in New York because of the concern that unlicensed persons are not bound by "ethical

rules" that govern the quality of care.

35.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct

assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory

and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or

his/her health care provider. The implementing regulation adopted by the Superintendent of

Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ...
> upon assignment by the applicant ... shall pay benefits directly to providers of health
> care services as covered under section five thousand one hundred two (a)(1) of the
> Insurance Law …

36.     Accordingly, for a health care provider to be eligible to bill for and to collect charges

from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual

provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill

for services, or to collect for those services from an insurer, where the services were rendered by

persons who were not employees of the professional corporation, such as independent contractors.

37.     In New York, claims for PIP Benefits are governed by the New York Workers'

Compensation Fee Schedule (the "NY Fee Schedule").

38.     When a healthcare services provider submits a claim for PIP Benefits using the

current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that:

(i) the service described by the specific CPT code that is used was performed in a competent manner

in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

39. Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

40. Beginning in 2021 and continuing through the present, the Defendants masterminded and implemented a complex fraudulent scheme in which PSP was used in succession and interchangeably to bill GEICO more than $1,150,000.00 for medically and psychologically unnecessary, illusory, and otherwise non-reimbursable psychology services in a period of less than four (4) months. In a "quick hit" fashion, the use of PSP was abandoned by the Defendants at the end of January of 2022, after millions of dollars were billed to GEICO and other New York automobile insurers.

### 1.     Gaining Access to Insureds

41. PSP has never had any legitimate indicia. It has never had any fixed treatment locations of any kind, has never maintained a stand-alone practice, has never been the owner or leaseholder in the real property from which it purported to provide psychological services, has never employed its own support staff, and has never advertised or marketed its services to the general public.

42.     Rather, access to Insureds was obtained through the payment of kickbacks or other financial incentives to the owners/operators of more than forty (40) Clinics located throughout the New York metropolitan area that specialized in "treating" patients with no-fault insurance who claimed to have been injured in automobile accidents. These Clinics, include, but are not limited to the following locations:

| Clinic Location | | | Clinic Location | | |
|---|---|---|---|---|---|
| 160-59 Rockaway Boulevard | Jamaica | NY | 137-42 Guy Brewer Boulevard | Jamaica | NY |
| 60 Belmont Avenue | Brooklyn | NY | 146 Empire Boulevard | Brooklyn | NY |
| 240-19 Jamaica Avenue | Jamaica | NY | 430 West Merrick Road | Valley Stream | NY |
| 92-08 Jamaica Avenue | Jamaica | NY | 2019 Williamsbridge Road | Bronx | NY |
| 9016 Sutphin Boulevard | Jamaica | NY | 788 Southern Boulevard | Bronx | NY |
| 89-25 130th Street | Richmond Hill | NY | 175 Fulton Avenue | Hempstead | NY |
| 552 East 180th Avenue | Bronx | NY | 116-5 Myrtle Avenue | Richmond Hill | NY |
| 3000 Eastchester Road | Bronx | NY | 4226 3rd Avenue | Bronx | NY |
| 1650 Eastern Parkway | Brooklyn | NY | 225-21 Linden Boulevard | Cambria Heights | NY |
| 2598 3rd Avenue | Bronx | NY | 108 Kenilworth Place | Brooklyn | NY |
| 611 East 76th Street | Brooklyn | NY | 127 Post Avenue | Westbury | NY |
| 3626 Bailey Avenue | Bronx | NY | 82-17 Woodhaven Boulevard | Ridgewood | NY |
| 2098 Rockaway Parkway | Brooklyn | NY | 22201 Hempstead Avenue | Jamaica | NY |
| 1655 Richmond Avenue | Staten Island | NY | 102-34 Atlantic Avenue | Ozone Park | NY |
| 30 South Central Avenue | Valley Stream | NY | 665 Pelham Parkway North | Bronx | NY |
| 1975 Liden Boulevard | Elmont | NY | 97-01 101st Avenue | Jamaica | NY |
| 3060 East Tremont Avenue | Bronx | NY | 135-25 79th Street | Howard Beach | NY |
| 2386 Jerome Avenue | Brooklyn | NY | 2436 Eastchester Road | Bronx | NY |
| 3626 East Tremont Avenue | Bronx | NY | 9801 Foster Avenue | Brooklyn | NY |
| 108-25 Merrick Boulevard | Jamaica | NY | 615 Seneca Avenue | Ridgewood | NY |
| 1100 Pelham Parkway South | Bronx | NY | 599 Southern Boulevard | Bronx | NY |
| 2558 Holland Avenue | Bronx | NY | 2354 Westchester Avenue | Bronx | NY |

43.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

44.    The Clinics provided facilities for the Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system. For example:

(i)    The Clinic located at 1655 Richmond Avenue, Staten Island, New York was a revolving door of more than 140 purportedly different healthcare providers;

(ii)    The Clinic located at 92-08 Jamaica Avenue, Jamaica, New York was a revolving door of more than 70 purportedly different healthcare providers; and

(iii)    The Clinic located at 97-01 101st Avenue, Jamaica, New York was a revolving door of more than 65 purportedly different healthcare providers.

45.    GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

46.    In fact, many of the Clinics identified in this Complaint are the same locations where other insurance fraud schemes took place during the same time frames, including similar fraudulent treatment and billing schemes involving psychological services, including:

(i)    the misappropriation of the license, name and sole proprietorship of Dianna Bruno Psy.D., LMHC ("Bruno");

(ii)     a fraudulent billing and treatment scheme involving Karin Gepp Ph.D. (A Sole Proprietorship) (the "Gepp Sole Proprietorship"), Gepp Psychological Services, PLLC (Gepp Psych"), and its purported owner Karin Gepp, Ph.D.;

(iii)    a fraudulent billing and treatment scheme involving MW Psychology, P.C. ("MW Psych"), MWaldman Corporation ("MWaldman Corp"), and its purported owner, Mel Waldman, Ph.D; and

(iv)     a fraudulent billing and treatment scheme involving Lynn Curcuro Consulting LTD ("LCC") and its purported owner Lynn Tenenbaum, Ph.D. ("Tenenbaum").

47.     Notably, LCC (which is a corporation that was dissolved in 2009) billed GEICO for the performance of Fraudulent Services at virtually all of the same Clinics where PSP was purportedly treating Insureds.  LCC stopped billing GEICO in the fall of 2021 and immediately thereafter, PSP began billing GEICO for the same Fraudulent Services at the same locations.  LCC and Tenenbaum are currently defendants in an action pending in the Eastern District of New York (Docket No.:  1:22-cv-04543-ARR-RLM)

48.     Notably, and in keeping with the fact that PSP was simply one of many interchangeable "cogs" in a fraudulent billing and treatment scheme at the Clinics, an Insured named SR was purportedly treated by PSP at a Clinic located at 222-01 Hempstead Avenue, Jamaica, New York.  Despite PSP being the treating provider, the notes attached to the billing from PSP for the services claimed to have been provided to SR contained a Health Insurance Portability and Accountability Act ("HIPAA") notice bearing Tenenbaum's letterhead instead of that for PSP:



*Dr. Lynn C. Tenenbaum PhD*

**Informed Consent**

This document contains important information about my professional services and business policies. It also contains summary information about the Health Insurance Portability and Accountability Act (HIPAA), a federal law that provides privacy protections and patient rights about the use and disclosure of you Protected Health Information (PHI) for the purposes of treatment, payment, and health care operations. Although these documents are long and sometimes complex, it is very important that you understand them. When you sign this document, it will also represent an agreement between us. We can discuss any questions you have when you sign them or at any time in the future.

Counseling is a relationship between people that works in part because of clearly defined rights and responsibilities held by each person. As a client in counseling, you have certain rights and responsibilities that are important for you to understand. There are also legal limitations to those rights that you should be aware of. I, as your counselor, have corresponding responsibilities to you. These rights and responsibilities are described in the following sections.

*Confidentiality*

Your counselor will make every effort to keep your personal information private. If you wish to have information released, you will be required to sign a consent form before such information will be released. There are some limitations to confidentiality to which you need to be aware. Your counselor may consult with a supervisor or other professional counselor in order to give you the best service. In the event that your counselor consults with another counselor, no identifying information such as your name would be released. Counselors are required by law to release information when the client poses a risk to themselves or others and in cases of abuse to children or the elderly. If your counselor receives a court order or subpoena, she may be required to release some information. In such a case, your counselor will consult with other professionals and limit the release to only what is necessary by law.

*Record Keeping*

Your counselor may keep records of your counseling sessions and a treatment plan, which includes goals for your counseling. These records are kept ensure a direction to your sessions and continuity in service. They will not be shared except with respect to the limits to confidentiality discussed in the Confidentiality section. Should the client wish to have their records released, they are required to sign a release of information which specifies what information is to be released and to whom. Records will be kept for at least 7 years but may be kept for longer. Records will be kept either electronically on a USB flash drive or in a paper file and stored in a locked cabinet in the counselor's office.

**Consent to Counseling**

Your signature below indicates that you have read both pages of this Agreement and agree to its terms.

Client Signature X  Date: 10/31/2021

49. The Clinics willingly provided access to Polino, PSP and the John Doe Defendants in exchange for kickbacks because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to high volumes of Insureds at the locations.

50. In general, the referral sources at the Clinics, including the John Doe Defendants, were paid a sum of money as part of a "pay-to-play" arrangement. Though the payments were typically disguised as "rent," they were, in reality, kickbacks for referrals and access to Insureds. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" to Polino, Catacora, Leon, Welsch, Matos, or Louis, or some other mental health practitioner allegedly associated with PSP

(collectively, the "Practitioner Defendants") who was purportedly present at the Clinic at that time, for psychological evaluation and testing, regardless of individual symptoms, presentation, or – in most cases – the total absence of any clinically significant psychological symptoms arising from any automobile accident.

51.     The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to one of the Practitioner Defendants, who were given access to the Clinics' offices on a transient basis pursuant to the payments made by the Owner Defendants to the Referral Sources.

52.     The unlawful kickback and referral arrangements were essential to the success of Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships with the Clinics and the referral sources, because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

53.     Polino, and the John Doe Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.  In fact, the John Doe Defendants operated PSP for only a short period of time in an effort to try and limit the billing for the Fraudulent Services submitted to GEICO and to "stay under the radar" of GEICO and other New York automobile insurers.

54.     PSP was simply one of many interchangeable entities used in succession and responsively to insurance companies' efforts to seek verification, examinations under oath and other information to try and verify the legitimacy of the services and eligibility of the multiple entities, such as the entities associated with Tenenbaum, Bruno, Gepp and Waldman.

## 2. **The Fraudulent Treatment and Billing Protocol**

55. Every Insured who was seen by the Practitioner Defendants was subjected to a psychiatric evaluation, as well as to a virtually identical series of unnecessary psychological testing and services that were provided pursuant to a predetermined protocol.

56. The Clinic "representatives" providing access and/or making the referrals were unlicensed individuals. Each step in the "treatment" protocol was designed to reinforce the rationale for the previous step and to justify the subsequent step, and thereby permit the generation of a maximum amount of no-fault billing for each Insured.

57. In fact, the battery of unnecessary psychological evaluation and psychological tests more fully described below were purportedly performed resulted in more than $1.15 million in billing to GEICO.

### A. **The Fraudulent Pre-Determined Treatment Protocol**

58. When an Insured was referred to the Practitioner Defendants pursuant to the unlawful referral arrangement, PSP would systemically bill for the same combination of CPT codes.

59. The following are representative examples of the CPT codes and charges utilized in billing submitted by the Defendants:

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 10/28/2021 | 430 West Merrick Blvd, Valley Stream, NY, 11580 | Psychiatric diagnostic evaluation with medical services | 1 | 90791 - 1B | $ 296.26 |
| 10/28/2021 | 430 West Merrick Blvd, Valley Stream, NY, 11580 | Psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes | 1 | 90885 - 1B | $ 105.64 |
| 10/28/2021 | 430 West Merrick Blvd, Valley Stream, NY, 11580 | Psychological testing, per hour of the physicians time (includes testing, interpretation, and reporting) | 7 | 96101 - 1B | $ 2030.84 |

**TOTAL CHARGES TO DATE $ 2432.74**

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | | | | |
|---|---|---|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING | ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | | CHARGES | |
| 10/14/21 | Facility | 11580 | 90885 -Review of records Panel 1 2 | 90885 | 1 | $88 04 | $88.04 |
| 10/14/21 | Facility | 11580 | 90791 -Psychiatric Exam Panel 1 2 | 90791 | 1 | $246 99 | $246.99 |
| 10/14/21 | Facility | 11580 | 96101 -Psychological Testing per Unit Panel 1 | 96101 | 7 5 | $241 77 | $1,813.25 |
| PLACE OF SERVICE ADDRESS   430 W Merrick Rd., Valley Stream, NY 11580 | | | | TOTAL CHARGES | | $2,148.18 | |
| 16 IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING | | | | | | | |

60.  More specifically, the referral of an Insured to the Practitioner Defendants would typically result in an initial series of charges to GEICO through PSP of more than $2,000.00 per Insured based on the Fraudulent Services.

61.  Furthermore, billing submitted by the Defendants was adjusted upward by falsely using a 1-B modifier in an attempt to further inflate the charges for the Fraudulent Services, once again billing for the same combination of CPT codes:

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 10/26/2021 | 2017 Williamsbridge Rd, Bronx, NY, 10461 | Psychiatric diagnostic evaluation with medical services | 1 | 90791 - 1B | $ 296 26 |
| 10/26/2021 | 2017 Williamsbridge Rd, Bronx, NY, 10461 | Psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes | 1 | 90885 - 1B | $ 105 64 |
| 10/26/2021 | 2017 Williamsbridge Rd, Bronx, NY, 10461 | Psychological testing, per hour of the physicians time (includes testing, interpretation, and reporting) | 7 | 96101 - 1B | $ 2030 84 |

**TOTAL CHARGES TO DATE  $ 2432 74**

62.  In other words, the amounts originally billed by the Defendants for the Fraudulent Services were not sufficient, so the Defendants manufactured a way to "enhance" them by further upward manipulation of the billing and associated CPT Codes.

63.  Despite the purported symptoms or lack of symptoms noted for each Insured, virtually every patient received the same treatment. For example:

(i)  On April 7, 2021, an Insured named AS was involved in an automobile accident. AS presented to the Clinic located at 1655 Richmond Avenue, Staten Island, New York (the "Richmond Avenue Clinic") and purportedly received a psychological evaluation and testing by Polino on November 10, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $296.24; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101 with a charge of $2,030.84;

(ii)  On April 26, 2021, an Insured named PH was involved in an automobile accident. PH presented to the Clinic located at 2098 Rockaway Parkway, Brooklyn, New York (the "Rockaway Parkway Clinic") and purportedly received a psychological evaluation and testing by Catacora on October 12, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $246.89; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $88.04; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101 with a charge of $1,813.00;

(iii)  On June 27, 2021, an Insured named DW was involved in an automobile accident. DW presented to the Clinic located at 9801 Foster Avenue, Brooklyn, New York (the "Foster Avenue Clinic") and purportedly received a psychological evaluation and testing by Catacora on October 14, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $246.89; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $88.04; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101 with a charge of $1,813.25;

(iv)  On July 5, 2021, an Insured named MR was involved in an automobile accident. MR presented to the Clinic located at 788 Southern Boulevard, Bronx, New York (the "Southern Boulevard Clinic") and purportedly received a psychological evaluation and testing by Matos on October 12, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $246.89; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $88.04; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101 with a charge of $1,813.25;

(v)  On August 6, 2021, an Insured named IV was involved in an automobile accident. IV presented to the Clinic located at 615 Seneca Avenue, Ridgewood, New York (the "Seneca Avenue Clinic") and purportedly received a psychological evaluation and testing by Polino on November 11, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx

purposes" under CPT code 90885-1B with a charge of $105.64 ; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(vi)     On August 9, 2021, an Insured named PG was involved in an automobile accident. PG presented to the Clinic located at 2386 Jerome Avenue, Brooklyn, New York (the "Jerome Avenue Clinic") purportedly received a psychological evaluation and testing by Welsch on October 11, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $246.89; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $88.04; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101 with a charge of $1,813.25;

(vii)    On August 17, 2021, an Insured named MF was involved in an automobile accident. MF presented to the Clinic located at 3060 East Tremont Avenue, Bronx, New York (the "East Tremont Avenue Clinic") and purportedly received a psychological evaluation and testing by Welsch on October 13, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $246.89; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $88.04; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101 with a charge of $1,813.25;

(viii)   On September 10, 2021, an Insured named DW was involved in an automobile accident. DW presented to the Clinic located at 60 Belmont Avenue, Brooklyn, New York (the "Belmont Avenue Clinic") and purportedly received a psychological evaluation and testing by Polino on November 8, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(ix)     On September 28, 2021, an Insured named LW located at 4226 3rd Avenue, Bronx, New York (the "4226 3rd Avenue Clinic") and purportedly received a psychological evaluation and testing by Catacora on October 13, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $246.89; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $88.04; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101 with a charge of $1,813.25;

(x)      On September 28, 2021, an Insured named OR was involved in an automobile accident. OR presented to the Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York (the "92-08 Jamaica Avenue Clinic") and purportedly received a psychological evaluation and testing by Louis on October 25, 2021.

GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xi)     On September 30, 2021, an Insured named HB was involved in an automobile accident. HB presented to the Clinic located at 30 South Central Avenue, Valley Stream, New York (the "South Central Avenue Clinic") and purportedly received a psychological evaluation and testing by Polino on November 11, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xii)    On October 15, 2021, an Insured named AC was involved in an automobile accident. AC presented to the Clinic located at 2598 3rd Avenue, Bronx, New York (the "2598 3rd Avenue Clinic") and purportedly received a psychological evaluation and testing by Polino on October 20, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $246.89; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $88.04; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101 with a charge of $1,813.25;

(xiii)   On October 15, 2021, an Insured named EC was involved in an automobile accident. ES presented to the Clinic located at 430 West Merrick Road, Valley Stream, New York (the "West Merrick Road Clinic") and purportedly received a psychological evaluation and testing by Polino on October 28, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xiv)    On October 15, 2021, an Insured named TJ was involved in an automobile accident. TJ presented to the Clinic located at 2017 Williamsbridge Road, Bronx, New York (the "Williamsbridge Road Clinic") and purportedly received a psychological evaluation and testing by Polino on November 22, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xv)    On October 23, 2021, an Insured named TG was involved in an automobile accident. TG presented to the Clinic located at 240-19 Jamaica Avenue, Jamaica, New York (the "240-19 Jamaica Avenue Clinic") and purportedly received a psychological evaluation and testing by Polino on November 4, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xvi)   On November 4, 2021, an Insured named MB was involved in an automobile accident. Thereafter, MB presented to the Clinic located at 116-5 Myrtle Avenue, Richmond Hill, New York (the "Myrtle Avenue Clinic") and purportedly received a psychological evaluation and testing by Polino on December 1, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xvii)  On November 29, 2021, an Insured named KB was involved in an automobile accident. Thereafter, KB presented to the Clinic located at 1975 Linden Boulevard, Elmont, New York (the "Linden Boulevard Clinic") and purportedly received a psychological evaluation and testing by Polino on December 30, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xviii) On December 4, 2021, an Insured named DD was involved in an automobile accident. DD presented to the Clinic located at 8925 130th Street, Richmond Hill, New York (the "130th Street Clinic") and purportedly received a psychological evaluation and testing by Polino on December 20, 2021. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84; and

(xix)   On January 3, 2022, an Insured named RY was involved in an automobile accident. RY presented to the Clinic located at 137-42 Guy Brewer Avenue, Jamaica, New York (the "Guy Brewer Avenue Clinic") and purportedly received a psychological evaluation and testing by Polino on January 13, 2022. GEICO then received billing from PSP for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx

purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84.

64.     In keeping with the fact that the pre-determined treatment protocol utilized by the Defendants to fraudulently bill GEICO for treatment and testing that was either unnecessary or never occurred, on multiple occasions, Insureds who were purportedly involved in the same motor vehicle accident received the exact same treatment and recommendations, regardless of their reported symptoms and diagnosis. For example:

(i)     On July 5, 2021, two Insureds – SB and BG – were involved in the same automobile accident. Thereafter, SB and BG both presented to the Guy Brewer Avenue Clinic and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both SB and BG for the date of service November 12, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of  "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(ii)    On July 15, 2021, two Insureds – GC and SL – were involved in the same automobile accident. Thereafter, GC and SL both presented to the Williamsbridge Road Clinic and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both GC and SL for the date of service December 14, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of  "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(iii)   On August 16, 2021, two Insureds – GP and JP – were involved the in same automobile accident. Thereafter, GP and JP both presented to the West Merrick Road Clinic and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both GP and JP for the date of service October 14, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $246.89; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $88.04; and (iii) seven hours of  "psychological testing pr hr with patient" under CPT code 96101 with a charge of $1,813.25;

(iv)    On August 18, 2021, two Insureds – JD and SR – were involved in the same automobile accident. Thereafter, JD and SR both presented to the Clinic located at 2201 Hempstead Avenue, Jamaica, New York (the "Hempstead Avenue Clinic") and were both purportedly evaluated and tested by Polino and Louis, respectively. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both JD and SR for the date of service October 21, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $246.89; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $88.04; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101 with a charge of $1,813.25;

(v)    On August 22, 2021, two Insureds – SP and CS – were involved in the same automobile accident. Thereafter, SP and CS both presented to the Clinic located at 9016 Sutphin Boulevard, Jamaica, New York (the "Sutphin Boulevard Clinic") and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both SP and CS for the date of service December 6, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of  "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(vi)    On September 25, 2021, three Insureds – DA, DD, and DI – were involved in the same automobile accident. Thereafter, DA, DD, and DI each presented to the Clinic located at 611 East 76th Street, Brooklyn, New York (the "East 76th Street Clinic") and were each purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of DA, DD, and DI for the date of service October 13, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 with a charge of $246.89; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885 with a charge of $88.04; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101 with a charge of $1,813.25;

(vii)    On September 27, 2021, two Insureds – MF and NF – were involved in the same automobile accident. Thereafter, MF and NF both presented to the Clinic located at 1650 Eastern Parkway, Brooklyn, New York (the "Eastern Parkway Clinic") and were both purportedly evaluated and tested by Leon. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both MF and NF for the date of service October 28, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii)

seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(viii)    On October 9, 2021, two Insureds – LC and GR – were involved in the same automobile accident. Thereafter, LC and GR both presented to the Clinic located at 82-17 Woodhaven Boulevard, Ridgewood, New York (the "Woodhaven Boulevard Clinic") and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both LC and GR for the date of service October 26, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(ix)    On October 15, 2021, two Insureds – JS and SS – were involved in the same automobile accident. Thereafter, JS and SS both presented to the Clinic located at 108 Kenilworth Place, Brooklyn, New York (the "Kenilworth Place Clinic") and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both JS and SS for the date of service December 2, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(x)    On October 15, 2021, two Insureds – CB and RS – were involved in the same automobile accident. Thereafter, CB and RS both presented to the Clinic located at 552 East 180th Street, Bronx, New York (the "East 180th Street Clinic") and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both CB and RS for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xi)    On October 19, 2021, two Insureds – JH and DW – were involved in the same automobile accident. Thereafter, JH and DW both presented to the Clinic located at 160-59 Rockway Boulevard, Jamaica, New York (the "Rockaway Boulevard Clinic") and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both JH and DW for the date of service November 11, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii)

"psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xii)     On October 29, 2021, two Insureds – SH and AW – were involved in the same automobile accident. Thereafter, SH and AW both presented to the Belmont Avenue Clinic and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both SH and AW for the date of service November 22, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xiii)    On November 2, 2021, two Insureds – KA and JC – were involved in the same automobile accident. Thereafter, KA and JC both presented to the Richmond Avenue Clinic and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both KA and JC for the date of service January 12, 2022, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xiv)     On November 6, 2021, two Insureds – RA and JR – were involved in the same automobile accident. Thereafter, RA and JR both presented to the 240-19 Jamaica Clinic and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both RA and JR for the date of service December 27, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xv)      On November 21, 2021, two Insureds – JC and MC – were involved in the same automobile accident. Thereafter, JC and MC both presented to the Linden Boulevard Clinic and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both JC and MC for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xvi)   On November 21, 2021, two Insureds – YF and DR – were involved in the same automobile accident. Thereafter, YF and DR both presented to the Belmont Avenue Clinic and were each purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of YF and DR for the date of service December 13, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xvii)  On November 18, 2021, three Insureds – SB, SG, and KM – were involved in the same automobile accident. Thereafter, SB, SG, and KM each presented to the Myrtle Avenue Clinic and were each purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of SB, SG, and KM for the date of service December 15, 2021, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xviii) On November 18, 2021, two Insureds – FD and AG– were involved in the same automobile accident. Thereafter, FD and AG each presented to the Clinic located at 102-34 Atlantic Avenue, Ozone Park, New York (the "Atlantic Avenue Clinic") and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both FD and AG for the date of service January 12, 2022, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(xix)   On December 20, 2021, two Insureds – CO and SR – were involved in the same automobile accident. Thereafter, CO and SR both presented to the Clinic located at 175 Fulton Avenue, Hempstead, New York (the "Fulton Avenue Clinic") and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both CO and SR for the date of service January 18, 2022, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84; and

(xx)     On January 4, 2022, two Insureds – PG and CH – were involved in the same automobile accident. Thereafter, PG and CH both presented to the Clinic located at 108-25 Merrick Boulevard, Jamaica, New York (the "Merrick Boulevard Clinic") and were both purportedly evaluated and tested by Polino. After the purported evaluation and testing, PSP submitted bills to GEICO on behalf of both PG and CH for the date of service January 5, 2022, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84.

**B.      The Fraudulent Diagnostic Interview Examinations and Charges**

65.     Once an Insured was referred to one of the Practitioner Defendants or some other individual associated with PSP pursuant to the unlawful referral arrangements, the Practitioner Defendants or other mental health practitioner initially purported to conduct a diagnostic evaluation.

66.     The diagnostic evaluation was then billed to GEICO in the name of PSP using CPT code 90791 with a resulting charge of $246.89 or using CPT code 90791-1B with a resulting charge of $296.26.

67.     The diagnostic interview examinations were fraudulent, to the extent they were performed at all, because they were: (i) psychologically unnecessary; (ii) conducted pursuant to the improper financial arrangements between the Defendants and the Clinics and not pursuant to the documented and clinically reasonable needs of the Insureds; and (iii) purportedly conducted by Polino, which virtually never actually happened.

68.     In addition, in the claims for diagnostic evaluations identified in Exhibit "1", the bills and supporting documents falsely represented that they were legitimately performed in the first instance.

**a.      Basic, Legitimate Psychiatric Diagnostic Evaluations**

69.     A psychiatric diagnostic evaluation is an integrated assessment in which a mental health practitioner elicits patient data and then uses that data to establish a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan for that patient.

70.     In a legitimate clinical setting, during a psychiatric diagnostic evaluation, the data necessary to derive a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan for a patient, is elicited through a clinical interview and a mental status examination.

71.     The clinical interview is a face-to-face encounter between the mental health practitioner and the patient during which the practitioner observes the patient and elicits information regarding the patient's chief complaint, medical history, psychiatric history, family history, and social history.

72.     The mental status examination is a structured assessment of the patient's behavioral and cognitive functioning. It includes descriptions of the patient's appearance and general behavior, level of consciousness and attentiveness, motor and speech activity, mood and affect, thought and perception, attitude, insight and judgment, orientation, attention, concentration and other cognitive areas.  Typically, some components of the mental status examination are obtained through observation and other components are obtained through questioning of the patient.

73.     In non-complex cases, a psychiatric diagnostic evaluation consisting of a clinical interview and a mental status examination will typically elicit patient data sufficient to establish a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan.  In an atypical or complex case, where a mental health practitioner is unable to establish a preliminary diagnosis based on a patient interview and a mental status examination, that mental health practitioner may choose to incorporate simple self-administered or self-scored inventories, screening tests, or other similar tests as part of the psychiatric diagnostic evaluation.  The use of

these simple types of inventories/tests are considered part of the evaluation service and are not separately billable as psychiatric testing.

### b.    The Medically Unnecessary Diagnostic Evaluations

74.    In the claims identified in Exhibit "1", virtually none of the Insureds suffered clinically significant psychiatric symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation would have been medically necessary.

75.    In a legitimate clinical setting, a psychiatric diagnostic evaluation is medically necessary when a patient has a psychiatric illness and/or is demonstrating emotional or behavioral symptoms that manifest in inappropriate behavior patterns or maladaptive functioning in personal or social settings, when a patient's baseline functioning is altered by suspected illness or symptoms, or when a patient exhibits a sudden change in behavior.

76.    In keeping with the fact that in the claims identified in Exhibit "1", virtually none of the Insureds suffered clinically significant psychiatric symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, as nearly all of the Insureds whom the Defendants purported to treat were involved in very minor, "fender–bender" accidents.

77.    For example, in many of the claims identified in Exhibit "1", contemporaneous police reports indicated that the Insureds' accidents involved low-speed, low-impact collisions, the Insureds' vehicles were drivable following the accidents, and no one was seriously injured in the underlying accidents or injured at all.  In addition, in the vast majority of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as the result of their accidents.

78.    It is highly improbable that these mostly trivial "fender-benders" – which virtually never resulted in serious physical injury – would have caused clinically significant psychiatric

symptoms in any of the Insureds who purportedly experienced them, much less in large volumes of Insureds who happened to show up – without appointments – at one of the Clinics on the same day.

79.     The Practitioner Defendants purported to provide the diagnostic evaluations in order to establish "clinical support" for the charges that were submitted using CPT code 90791, as well as to establish "clinical support" for additional Fraudulent Services that they purported to provide to the Insureds, including "psychiatric testing".  In fact, the charges submitted through PSP for the purported psychiatric diagnostic evaluations falsely represented that the evaluations were legitimately performed in the first instance.

80.     In fact, legitimate clinical interviews and mental status examinations were never actually performed and the Practitioner Defendants simply used a series of "templated" questionnaires and forms that were limited in scope, not intended to have any legitimate benefit for the Insureds that were subjected to them, and conducted in order to establish a basis for the additional Fraudulent Services to which the Practitioner Defendants purported to subject the Insureds, including "psychiatric testing", as well as to establish a basis for other medically unnecessary healthcare services that the referral sources could purport to provide to the Insureds.

81.     Irrespective of any data elicited through the putative clinical interview and mental status examination of any particular Insured, virtually every diagnostic interview examination report submitted to GEICO by the Defendants contained language that was duplicated across all other reports. Only the Insureds' respective background information was unique to any particular patient. In almost every case, the "Treatment Recommendation" section consisted of a checklist where the following recommendation was checked off:

> **Treatment Recommendation**: Psychotherapy/Counseling to assist in the alleviation of presenting symptoms and therapy enhance physical recovery.

(A representative sample of the Defendants diagnostic interview examination "reports" containing this identical, boilerplate language is annexed hereto as Exhibit "2").

82.     This pre-determined treatment recommendation is evidenced throughout the records submitted to GEICO.  Despite the minimal symptoms or lack of symptoms purportedly reported by Insureds, virtually every Insured received the same treatment recommendation. For example:

(i)     On May 26, 2021, an Insured named NM was involved in an automobile accident. Thereafter, NM purportedly underwent a psychological evaluation at the Eastchester Road Clinic by PSP from Catacora. NM purportedly reported that his psychological symptoms included "fear of driving or being a passenger, feeling sad, anxiety, sleep problems, worries, always tired, cries easily, frequent thoughts of the accident, mood swings, feeling nervous, fears". Catacora purportedly diagnosed NM with anxiety and recommended the following treatment: "Psychotherapy/Counseling to assist in the alleviation of presenting symptoms and therapy enhance physical recovery.";

(ii)    On September 11, 2021, an Insured named DM was involved in an automobile accident. Thereafter, DM purportedly underwent a psychological evaluation at the East Tremont Avenue Clinic by PSP from Welsch. DM purportedly reported that he had no psychological symptoms. Welsch purportedly diagnosed DM with no psychological conditions, however, Welsch recommended the following treatment: "Psychotherapy/Counseling to assist in the alleviation of presenting symptoms and therapy enhance physical recovery.";

(iii)   On September 25, 2021, an Insured named RD was involved in an automobile accident. Thereafter, RD purportedly underwent a psychological evaluation at the West Merrick Road Clinic by PSP from Louis. RD purportedly reported that his psychological symptoms included "fear of driving or being passenger, feeling sad, always tired, blurry vision, feeling nervous, sensitive to light". Louis purportedly diagnosed RD with no psychological conditions, however, Louis recommended the following treatment: "Psychotherapy/Counseling to assist in the alleviation of presenting symptoms and therapy enhance physical recovery.";

(iv)    On October 23, 2021, an Insured named NF was involved in an automobile accident. Thereafter, NF purportedly underwent a psychological evaluation at the Belmont Avenue Clinic by PSP from Welsch. NF purportedly

reported that her psychological symptoms included "anxiety, sleep problems." Welsch purportedly diagnosed NF with no psychological conditions, however, Welsch recommended the following treatment: "Psychotherapy/Counseling to assist in the alleviation of presenting symptoms and therapy enhance physical recovery."; and

(v)     On October 30, 2021, an Insured named LK was involved in an automobile accident. Thereafter, LK purportedly underwent a psychological evaluation at the Guy Brewer Avenue Clinic by PSP from Catacora. LK purportedly reported that her psychological symptoms included "fear of driving or being a passenger, feeling sad, anxiety, sleep problems, worried, cries easily, blurry vision, feeling lonely, frequent thoughts of the accident, feeling nervous, fears, memory problems/confusion, feeling that you will never get better, sensitive to light". Catacora purportedly diagnosed LK with no psychological conditions, however, Catacora recommended the follow treatment: "Psychotherapy/Counseling to assist in the alleviation of presenting symptoms and therapy enhance physical recovery."

83.     In generating the reports, the Practitioner Defendants simply checked off options regarding an Insured's status, which often indicated that the Insured "has shown no significant improvement" and filled in blank lines with the Insureds' claim information to create the fake impression that the "psychiatric diagnostic evaluation" was actually and properly performed. In fact, they either were not performed at all, or were not meant to have any legitimate benefit for the Insureds that were subjected to them and were only conducted for the financial benefit of the Defendants. The following are representative examples of the Practitioner Defendant's pre-printed "reports":



84.     For instance, for virtually every Insured, the notes submitted to GEICO from PSP included a pre-printed checklist of symptoms from which Insureds purportedly reported their symptoms.  Notably, Insureds allegedly reported the same symptoms from the below checklist, including "frequent thoughts of the accident" and "fear of driving or being a passenger".

Susan J Polino PhD

Date: 10·9·21

**BEHAVIORAL SELF CONCENT & SELF REFERRAL FORM**

| | |
|---|---|
| ☑ FEAR OF DRIVING OR BEING A PASSANGER | ☑ FREQUENT THOUGHTS OF THE ACCIDENT |
| ☑ FEELING SAD | ☐ DEPRESSION |
| ☑ ANXIETY | ☐ MOOD SWINGS |
| ☑ SLEEP PROBLEMS | ☑ FEELING NERVOUS |
| ☑ WORRIES | ☑ FEARS |
| ☑ ALWAYS TIRED | ☐ LOCK OF MOTIVATION |
| ☑ CRIES EASILY | ☐ MEMORY PROBLEM/CONFUSION |
| ☐ NOT WANTING TO BE AROUMD PEOPLE | ☐ AGGRESSION/ANGER |
| ☐ FIGHTING WITH FAMILY AND FRIENDS | ☐ FEELING YOU WILL NEVER GET BETTER |
| ☐ BLURRY VISION | ☐ HEARING LOSS AND TINNITUS (RINGING IN THE EARS) |
| ☐ SENSITIVE TO NOISE | ☐ SESITIVE TO LIGHT |
| ☐ FEELING LONELY | ☐ FEELING OF HURTING YOURSELF |

Based on the symptoms I reported above I wish to be evaluated and treated pursuant to my NYS PIP Coverage and Rights.

I Agree to receive face to face teletherapy treatments if clinically warranted by a psychotherapist.

Patient Signature:   X ██████████████

85.     Not only did Polino, PSP and the John Doe Defendants submit improper billing for the psychiatric diagnostic evaluations, they also routinely "unbundled" the charges that they submitted in order to maximize the billing to GEICO.

86.     For instance, on the same dates that the Defendants submitted charges for the psychiatric diagnostic evaluations, they routinely also submitted separate charges using CPT code 90885, typically resulting in a charge of $88.04 or under CPT Code 90885-1B, typically resulting in a charge of $105.64.

87.     A healthcare provider's use of CPT code 90885 represents to an insurer that a psychologist conducted a "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes." The Defendants submitted these charges to GEICO despite the fact that any review and evaluation of an Insureds' medical and psychological records would have been included and reimbursed as an element of the psychiatric diagnostic evaluation.  In other words, the Defendants cannot conduct and bill for a psychiatric diagnostic evaluation, and then bill separately for record reviews of medical or psychological records.  The following are representative examples:

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 11/01/2021 | 60 Belmont Ave, Brooklyn, NY, 11212 | Psychiatric diagnostic evaluation with medical services | 1 | 90791 - 1B | $ 296.26 |
| 11/01/2021 | 60 Belmont Ave, Brooklyn, NY, 11212 | Psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes | 1 | 90885 - 1B | $ 105.64 |
| 11/01/2021 | 60 Belmont Ave, Brooklyn, NY, 11212 | Psychological testing, per hour of the physicians time (includes testing, interpretation, and reporting) | 7 | 96101 - 1B | $ 2030.84 |

TOTAL CHARGES TO DATE $ 2432.74

| | YES | X | NO | | IF YES, describe your recommendation below | | See Attached Materials | |
|---|---|---|---|---|---|---|---|---|

**15 REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING | ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | | CHARGES | |
|---|---|---|---|---|---|---|---|
| 10/21/21 | Facility | 11429 | 90885 -Review of records Panel 1 2 | 90885 | 1 | $88.04 | $88.04 |
| 10/21/21 | Facility | 11429 | 90791 -Psychiatric Exam Panel 1 2 | 90791 | 1 | $246.89 | $246.89 |
| 10/21/21 | Facility | 11429 | 96101 -Psychological Testing per Unit Panel 1 | 96101 | 7 5 | $241.77 | $1,813.25 |

| PLACE OF SERVICE ADDRESS | 222-01 Hempstead Ave , Jamaica, NY 11429 | TOTAL CHARGES | $2,148.18 |
|---|---|---|---|

88.     Furthermore, the charges under CPT code 90885 and 90885-1B for alleged record reviews and evaluations falsely represented that the service had been performed, when in fact, the Practitioner Defendants never reviewed nor evaluated any records to support the charges.

89.     This conclusion is illustrated by the fact that the section of the reports accompanying the PSP billing entitled "The Following Medical Records Were Available For Review" virtually never indicated what records were actually reviewed. Rather, on virtually every form the only indication was that a "police report" was reviewed. Further, virtually every form simply indicated that, "[t]he review of medical records confirmed that the patient was subjected to a MVA." The following is a representative example:

**THE FOLLOWING MEDICAL RECORDS WERE AVAILABLE FOR REVIEW:**

Police Report        Medical Records        Police Report

Other_____

The review of medical records confirmed that the patient was subjected to a:

MVA        Motorcycle        Bicycle        Pedestrian Hit        Fall

Other:_____

### C.    The Fraudulent "Psychological Testing" Charges

90.    On the same day that Insureds in the claims identified in Exhibit "1" were purportedly subjected to a diagnostic evaluation, the Practitioner Defendants purported to provide those same Insureds with a battery of needless psychological tests.

91.    Polino, PSP and the John Doe Defendants caused the psychological testing to be billed to GEICO and other New York automobile insurers under CPT code 96101, systemically billing for seven (7) hours of testing per Insured, which resulted in routine charges of $1,813.25 per round of testing per Insured.  As discussed in further detail below, psychological testing was routinely billed at an even higher rate using the "1B" modifier, under CPT code 96101-1B, systemically billing for seven (7) hours of testing, which resulted in routine charges of $2,030.84 per round of testing per Insured.

92.    The psychological testing was unnecessary, and conducted, to the extent it was conducted at all, pursuant to the improper financial arrangements between the Defendants and the Clinics.

93.    In keeping with the fact that the "psychiatric testing" was medically and psychologically unnecessary, the vast majority of Insureds did not suffer from any clinically significant psychiatric symptoms as a result of their accidents, which were largely minor "fender benders".  Even if any of the Insureds did suffer clinically significant psychiatric symptoms as a result of putative accidents, which they did not, in a legitimate clinical setting, the diagnostic evaluation would typically be the only service necessary to formulate a diagnosis and treatment plan for individual Insureds in non-complex psychological cases.

94.    Psychological testing is only indicated in complex psychological cases, and only where the particular testing administered is intended to augment the findings from the initial

clinical interview and mental status examination and to clarify a differential diagnosis. In fact, the fraudulent testing protocol employed by the Defendants here is contrary to the New York Workers Compensation, Behavioral Health Fee Schedule (the "Fee Schedule") ground rules, which specifically states that "Psychological Tests should not be used routinely".

95.     In the claims for "psychiatric testing" identified in Exhibit "1" none of the Insureds who purportedly were subjected to "psychiatric testing" by the Practitioner Defendants presented with complex psychiatric symptoms.

96.     Rather, each Insured, to the extent they suffered any clinically significant psychiatric symptoms as a result of a putative automobile accident, experienced an obvious precipitant (i.e., the underlying automobile accident) and developed the alleged psychiatric symptoms in response to the accident. In straightforward, non-complex cases such as these, the clinical interview and mental status examination portions of the psychiatric diagnostic evaluation are sufficient mechanisms for gathering the patient data necessary to formulate an individualized diagnosis and treatment plan.

97.     Furthermore, even if the Insureds presented with complex psychiatric symptoms attributable to their minor automobile accidents, which they did not, the "psychiatric testing" that the Practitioner Defendants purported to provide to the Insureds would not have elicited any significant data that could not have been elicited during the clinical interview and mental status examination portions of a legitimate psychiatric diagnostic evaluation. Furthermore, as noted above, simple self-administered or self-scored inventories, screening tests, or other similar tests are considered part of the psychiatric diagnostic evaluation service and are not separately payable as psychiatric testing.

98.     In actuality, the tests employed by the Practitioner Defendants were merely a handful of pre-printed checklists and inventories that automatically were distributed to the Insureds by the front-desk receptionists at the Clinics pursuant to the unlawful referral relationships.  The Insureds were then invited to check off the psychological symptoms they purportedly were experiencing.   The following are representative of examples of the pre-printed checklists, ironically entitled "Behavior Self **Concent** & Self Referral Form":



99.     The Defendants would then, after already submitting a bill to GEICO with only the above forms as "test notes", concoct a "Psychological Assessment Report", which was virtually always sent to GEICO months after the billing for the purported testing had already been submitted.  These "reports" were templates that included the same "interpretation" and "final recommendations" for virtually every Insured.  The below are representative examples:

| SUMMARY OF FINDINGS | | |
| --- | --- | --- |

**TESTS AND RESULTS**

| | | |
| --- | --- | --- |
| BDI-II: | 19 | Mild |
| PHQ-9: | 11 | Moderate |
| BAI: | 23 | Moderate |
| PC-PTSD-5: | 4 | Meets criteria for PTSD |

NSI: ▮▮▮▮ reported the following symptoms as disturbing in the last two weeks: Felling dizzy, loss of balance, poor coordination, clumsy, headaches, hearing difficulty, sensitivity to noise ,numbness or tingling on parts of my body, loss of appetite or increased appetite, forgetfulness, can't remember things, difficulty making decisions, slowed thinking, difficulty getting organized, can't finish things , fatigue, loss of energy, getting tired easily, difficulty falling or staying asleep, feeling anxious or tense, feeling depressed or sad, irritability, easily annoyed, poor frustration tolerance, feeling easily overwhelmed by things.

**INTERPRETATION**
The results of this evaluation indicate ▮▮▮▮ is suffering from emotional impairments, in addition to his physical pain, which are consequently and causally related to the accident on 01/29/2021

**DIAGNOSIS/DIAGNOSES AND CODE – Based on ICD-10/DSM-5**
*The test results are consistent with the criteria for the following diagnosis/diagnoses:*

1. **F43.0 Acute Stress Disorder**
2. **F41.1 Anxiety**

**FINAL RECOMMENDATIONS**

▮▮▮▮ should receive Psychotherapy/Counseling to assist in the alleviation of presenting symptoms and thereby enhance physical recovery.

| SUMMARY OF FINDINGS | | |
| --- | --- | --- |

**TESTS AND RESULTS**

| | | |
| --- | --- | --- |
| BDI-II: | 13 | Mild |
| PHQ-9: | 2 | Minimal |
| BAI: | 7 | Minimal |
| PC-PTSD-5: | 0 | Does not meet criteria for PTSD |

NSI ▮▮▮▮ reported the following symptoms as disturbing in the last two weeks: feeling depressed or sad.

**INTERPRETATION**
The results of this evaluation indicate ▮▮▮▮ is suffering from emotional impairments, in addition to his physical pain, which are consequently and causally related to the accident on 9/6/2021

**DIAGNOSIS/DIAGNOSES AND CODE – Based on ICD-10/DSM-5**
*The test results are consistent with the criteria for the following diagnosis/diagnoses:*
1. **F43.21 Adjstment Disorder with Depressed Mood**

**FINAL RECOMMENDATIONS**
▮▮▮▮ should receive Supportive Psychotherapy utilizing Cognitive Therapy and/or Biofeedback, at least once a week in order to cope with his disability and regulate pain levels.

A representative sample of the Defendants' fraudulent "Psychological Assessment Reports", containing the identical, boilerplate language is annexed hereto as Exhibit "3".

100.    Furthermore, the Defendants' charges for the psychological testing were fraudulent because they systemically misrepresented that the tests always took seven (7) hours to perform,

when, in actuality, these "tests" consisted of the Insured filling out the above pre-printed checklist, and nothing more.

101.    The Defendants' charges for the psychological testing also routinely misrepresented that the Practitioner Defendants who purportedly administered the testing prepared genuine, written reports interpreting the test results.  Specifically, according to the Fee Schedule, the use of CPT codes 96101 represents that the treating psychologist has prepared a written report interpreting the psychological test results.

102.    That never happened.  Rather, the Practitioner Defendants simply filled in the blanks and checked off the pre-printed options.  The only unique component to each report was the Insureds' respective "date of accident".  In particular, and as set forth above, virtually every psychological testing report resulted in a verbatim recommendation for psychotherapy, as well as a verbatim description of what that course of psychotherapy would entail:

>    **Treatment Recommendation**: Psychotherapy/Counseling to assist in the alleviation of presenting symptoms and therapy enhance physical recovery.

A representative sample of the Defendants' fraudulent psychological test reports containing the identical, boilerplate language is annexed hereto as Exhibit "3".

103.    Virtually every boilerplate "psychological test report" generated by the Practitioner Defendants concluded with a false, predetermined "diagnosis" as the result of "emotional behavioral problems" incurred during an automobile accident.

104.    The Practitioner Defendants issued these phony "diagnoses" regardless of the individual circumstances or unique presentation of the Insured.

105.    In actuality, the vast majority of Insureds did not suffer from any other legitimate psychological problems as the result of the minor automobile accidents they supposedly

experienced, and in fact, many were given a diagnosis despite the fact that the reported that they experienced no symptoms.

106.     None of the Practitioner Defendants or any other mental health professional ever legitimately reviewed the results of the psychological testing or legitimately created or altered any Insured's treatment plan based upon the results of the testing.  Indeed, as set forth above, regardless of any individual Insureds purported test scores, every Insured received the same boilerplate treatment plan, and only a small fraction of the Insureds actually received any follow up psychological treatment and care.

**D.     The Fraudulent Psychotherapy Charges**

107.     Based upon the fraudulent, pre-determined outcome of the "psychological testing" and "psychiatric diagnostic evaluations", along with the phony diagnoses, the Defendants referred virtually every Insured to return for unnecessary psychotherapy sessions.  Then, one of the Practitioner Defendants, or some other individual associated with PSP, purported to perform the psychotherapy.

108.     These psychotherapy sessions were billed through PSP to GEICO using CPT Code 90837-1B, with a charge of $298.64.

109.     Like the Defendants' charges for the "psychiatric diagnostic evaluations" and "psychological testing", the charges for the psychotherapy were fraudulent in that the psychotherapy was medically and psychologically unnecessary, and was conducted, to the extent conducted at all, solely pursuant to the kickback arrangements between the Defendants and the Clinics and/or referral sources.  Indeed, as set forth above, virtually every Insured who purportedly was subjected to the psychotherapy did not have any clinically significant psychological symptoms arising from their putative automobile accidents.

110. The Defendants' charges for the psychotherapy sessions also were fraudulent because the billing represented that the services were reimbursable under CPT code 90837, which would have required that a licensed mental health practitioner spent 60 minutes with the Insured. In fact, neither Polino nor any other mental health practitioner associated with PSP ever spent 60 minutes with the Insureds. Rather, the psychotherapy sessions, if ever performed, never lasted more than 15-20 minutes.

**E. Fraudulent Misrepresentations Regarding the Identity of the Persons Performing the Fraudulent Services and Billing for Over 24 Hours on a Single Day**

111. To obtain payment for the Fraudulent Services, Polino, PSP, and the John Doe Defendants also falsely represented the identities of the mental health professionals who performed the services that were billed to GEICO through PSP. More specifically, every NF-3 submitted to GEICO intentionally misrepresented that Polino was the actual provider of the services.

112. In fact, Polino virtually never performed or directly supervised the vast majority of the Fraudulent Services that were allegedly provided to GEICO Insureds and billed to GEICO. Rather, virtually all the mental health testing and services that were billed to GEICO were performed by the Social Worker Defendants or other unlicensed individuals without any legitimate supervision or oversight by Polino or any other licensed psychologist.

113. Pursuant to New York Education Law §7605 Sect. 3 (13), an individual with a Master's level degree in psychology or its equivalent can practice psychology, including performing psychological testing and counseling, so long as that individual is "working under the supervision of a licensed psychologist." The Social Worker Defendants were not licensed psychologists, but at best held Master's level degrees in social work and some had no such

qualifications.  As a result, the No-Fault Law prohibited PSP from recovering of no-fault benefits from the services allegedly performed by the unsupervised Social Worker Defendants.

114.    Polino, PSP and the John Doe Defendants were well aware of the fact that PSP could not legitimately bill or recover for services provided by unsupervised mental health providers who were not licensed psychologists such as the Social Worker Defendants.  As such, they falsely listed Polino as the treating provider on every bill submitted to GEICO, and affixed photocopies of Polino's signature to bills to create the false appearance that Polino either performed or supervised the services purportedly provided.

115.    Polino, PSP and the John Doe Defendants billed GEICO for more than 3,400 hours of psychological testing allegedly performed between October 2, 2021 and January 21, 2022, an amount that is impossible for the relevant time period.

116.    In addition, there are multiple instances where the bills submitted to GEICO involve services purportedly provided to Insureds by Polino for a single date of service that exceed twenty-four (24) hours, including the following dates:

| Date of Service | Hours Billed to GEICO for Polino's Purported Services |
|---|---|
| 10/26/2021 | 77 |
| 10/12/2021 | 71 |
| 11/2/2021 | 66 |
| 10/28/2021 | 50 |
| 10/25/2021 | 42 |
| 10/29/2021 | 36 |
| 10/11/2021 | 35 |
| 10/13/2021 | 35 |
| 10/27/2021 | 28 |
| 11/5/2021 | 28 |

117.    Further, on multiple occasions, Polino, PSP and the John Doe Defendants billed GEICO for services purportedly performed by Polino at five (5) or more locations on a single date. For example:

(i)  On October 12, 2021, Polino purportedly rendered services to eighteen (18) different Insureds at six (6) different Clinic locations in two (2) different counties within the New York metropolitan area;

(ii)  On October 13, 2021, Polino purportedly rendered services to twelve (12) different Insureds at five (5) different locations in three (3) different counties within the New York metropolitan area;

(iii)  On December 12, 2021, Polino purportedly rendered services to thirteen (13) different Insureds at six (6) different Clinic locations in four (4) different counties within the New York metropolitan area;

(iv)  On December 13, 2021, Polino purportedly rendered services to twelve (12) different Insureds at five (5) different Clinic locations in two (2) different counties within the New York metropolitan area; and

(v)  On January 12, 2022, Polino purportedly rendered services to fourteen (14) different Insureds at five (5) different Clinic locations in three (3) different counties within the New York metropolitan area.

118.  Not only would it have been impossible for a single provider to perform over twenty-four hours of services in one day, but it was also impossible that Polino actually supervised the Social Worker Defendants who purportedly performed over twenty-four hours of services during a single date.

119.  The number of hours, both in the aggregate and on a per day basis goes well beyond that which Polino or any group of licensed psychologists could have legitimately performed and/or supervised.  What makes this scenario even more absurd is that the fact that the fraudulent billing for testing and services that Polino, PSP and the John Doe Defendants submitted or caused to be submitted to GEICO constituted only a fraction of the total fraudulent billing for psychological evaluations, testing, and services submitted through PSP to all automobile insurers in the New York automobile insurance market.  The instances identified above only address billing from GEICO and do not include other automobile insurers, which if counted, would make the hours two to three times greater if they received similar billing to that received by GEICO.

**F.      The Fraudulent Use of the "1B" Modifier in Billing**

120.      The fraudulent scheme also included the submission of claims to GEICO including a "1B" modifier, in order to further maximize the fraudulent reimbursement that they could extract from GEICO.

121.      Pursuant to the CPT codes set forth in the Fee Schedule, a "1B" modifier, "provides a 20 percent reimbursement increase for providers with the following WCB [Worker's Compensation Board] assigned provider rating codes: PN-P (Psychiatry), PN-ADP (Addiction Psychiatry), PN-PM (Pain Management), and PSY (Psychology)."

122.      As a part of the fraudulent scheme, Polino, PSP and the John Doe Defendants increased the charges submitted to GEICO by utilizing the "1B" modifier, resulting in the following charge increases, despite the fact that virtually every provider remained the same:

| CPT Code | Price Charged to GEICO without the "1B" Modifier | Price Charged to GEICO with the "1B" Modifier |
|---|---|---|
| 96101 (7 units) | $1,813.25 | $2,030.84 |
| 90791 | $246.89 | $296.26 |
| 90885 | $88.04 | $105.64 |

123.      The utilization of the "1B" modifier in bills submitted to GEICO allowed the Defendants to increase the already fraudulent charges across the battery of Fraudulent Charges, furthering their fraudulent scheme to extract payments from GEICO to which they were never entitled.

**G.      The Fraudulent Billing for Treatment and Testing Never Provided**

124.      The Defendants' fraudulent scheme also included billing on behalf of Insureds who never received any testing or treatment from PSP.

125.    On several instances where GEICO was billed for testing and services purportedly provided to Insureds by PSP, the Insureds reported to GEICO that they either did not receive any treatment or testing or received "treatment and testing" for significantly less time than the amount of time that GEICO was billed.  For example:

(i)     On November 14, 2021, an Insured named GR was involved in an automobile accident, and thereafter began treating at the Clinic located at 1674 East 22nd Street, Brooklyn, New York (the "East 22nd Street Clinic"). GR was then interviewed by a GEICO investigator regarding her treatment at the East 22nd Street Clinic. GR stated that she was told by the "front desk" that she was seeing a psychologist on one occasion, she then filled out paperwork which took her approximately one (1) hour and spoke with a psychologist for approximately 30 minutes. Despite this, GEICO received billing from PSP for the following services, including seven (7) hours of testing, on November 22, 2021: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84;

(ii)    On December 4, 2021, an Insured named DW was involved in an automobile accident, and thereafter began treating at the Sutphin Boulevard Clinic. DW was then interviewed by a GEICO investigator regarding his treatment at the Sutphin Boulevard Clinic. DW denied ever meeting with or receiving treatment from a psychologist. Despite this, GEICO received billing from PSP for the following services, including seven (7) hours of testing, on December 6, 2021: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84; and

(iii)   On December 4, 2021, an Insured named NH was involved in an automobile accident, and thereafter began treating at the Sutphin Boulevard Clinic. NH was then interviewed by a GEICO investigator regarding his treatment at the Sutphin Boulevard Clinic. NH stated that he was informed that he would be meeting with a psychologist on one occasion when he arrived at the Sutphin Boulevard Clinic, that he filled out a questionnaire which took approximately five (5) minutes, the spoke to someone for approximately 20-25 minutes. Despite this, GEICO received billing from PSP for the following services, including seven (7) hours of testing, on December 6, 2021: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B with a charge of $296.26; (ii) "psychiatric eval hospital records dx

purposes" under CPT code 90885-1B with a charge of $105.64; and (iii) seven hours of "psychological testing pr hr with patient" under CPT code 96101-1B with a charge of $2,030.84.

## H. The Fraudulent Billing for Independent Contractor Services

126. The Defendants' fraudulent scheme also included the submission of claims to GEICO in the name of PSP seeking payment for services provided by individuals that it never employed.

127. Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors -- the healthcare services must be provided by the billing provider itself, or by its employees.

128. Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

129.    From October of 2021 through January of 2022 (less than 4 months), more than five hundred (500) separate bills were submitted to GEICO seeking payment for the Fraudulent Services purportedly performed by individuals other than Polino, while falsely representing in almost every bill that Polino was the provider of the service in question. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill if an accurate representation had been made regarding who actually performed the services and their relationship to PSP, which the John Doe Defendants were unlawfully operating and controlling.

130.    In fact, every NF-3 form that was submitted to GEICO by or on behalf of the Defendants falsely represented that Polino, as the owner of the practice, actually performed the service – the following is a representative example:

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
PAGE 3

| 16  IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING: | | | | | |
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Susan J  Polino | PhD | Lic # 015546-01 | No | | |
| | | | | | ˙ |
| | | | | | |

131.    Additionally, every NF-3 form submitted to GEICO by the Defendants falsely represented that Polino, as the owner of the practice, had actually reviewed and approved the billing for the services as well as the AOBs (assignment of benefits forms) that would have enabled direct payment to have been made to the sole proprietorship for services allegedly rendered to the patient.

132.    In fact, the statements in each of the NF-3 forms were false and fraudulent in that the social workers and other unlicensed persons who performed the Fraudulent Services were never: (i) employed by Polino or PSP; (ii) under her direction and/or control; or (iii) paid by Polino.

133.    Because the Fraudulent Services -- to the extent provided at all -- were performed by individuals not employed by either Polino or PSP, the Defendants never had any right to bill or to collect No-fault benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all of the others identified in this complaint.  The misrepresentations and acts of fraudulent concealment outlined in this complaint were consciously designed to mislead GEICO into believing that it was obligated to pay for the Fraudulent Services, when in fact GEICO was not.

### III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

134.    To support their fraudulent charges, Polino and the John Doe Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms and reports in the name of PSP seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

135.    The NF-3 forms, reports, assignment of benefits and other documents submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms and other supporting documentation submitted to GEICO uniformly misrepresented that PSP was legitimately owned and operated by Polino, when in fact at all relevant times PSP was secretly owned, operated, managed and controlled by the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

(ii)    The NF-3 forms and other supporting documentation submitted to GEICO uniformly misrepresented to GEICO that the Fraudulent Services were provided, to the extent provided at all, were medically necessary and clinically indicated, when in fact, the Fraudulent Services were provided pursuant to the dictates of unlicensed laypersons, not based upon legitimate

decisions by licensed healthcare providers, and as a result of illegal financial arrangements established between the Defendants and the Clinics;

(iii)    The NF-3 forms and other supporting documentation submitted to GEICO uniformly misrepresented to GEICO that the Fraudulent Services were medically or psychologically necessary, when, in fact, the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    The NF-3 forms and other supporting documentation uniformly misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(v)    The NF-3 forms and other supporting documentation uniformly misrepresented to GEICO that the Fraudulent Services were provided by Polino, when in fact they were provided by unlicensed persons and unsupervised MSWs, in contravention of New York law; and

(vi)    The NF-3 forms and other supporting documentation uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 despite the fact that the services were provided by individuals who were not employed by PSP.

**IV.**    **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

136.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

137.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying scheme and went to great lengths to accomplish this concealment.

138.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that, at all relative times, PSP was unlawfully operated,

managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers.

139.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that PSP derived their patient referrals through financial payments that the Defendants made to the Clinics/Referral Sources.  Indeed, the Defendants entered into complex financial arrangements with the Clinics/Referral Sources that were designed to, and did, conceal the nature of the financial and referral arrangements.

140.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed, to the extent performed at all, pursuant to a predetermined protocol that maximized the charges that Defendants could submit to GEICO.

141.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically and psychologically unnecessary and often were performed, to the extent performed at all, by: (i) unlicensed persons and unsupervised MSWs, in contravention of New York law; and (ii) by individuals who were not employed by PSP.

142.    The Defendants hired law firms to pursue collection of the charges from GEICO. These law firms routinely filed expensive and time-consuming litigation against GEICO if the charges were not promptly paid in full.

143.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.  GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid, verified documents submitted to

GEICO in support of the charges at issue, combined with the material misrepresentations and litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $790,000.00 dollars based upon payments made by GEICO in reliance on the charges that the Defendants submitted.

144.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against PSP**
**(Declaratory Relief under 28 U.S.C. §§2201 and 2202)**

145.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 144 above.

146.     There is an actual case and controversy between GEICO and PSP, regarding more than $175,000.00 in pending billing submitted through PSP.

147.     PSP has no right to receive payment for any pending bills submitted to GEICO because PSP is a healthcare "practice" that was not at the relevant times, under the control and direction of Polino, but rather, was secretly owned, operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers.

148.     PSP has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

149.     PSP has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were unnecessary and were performed, to the extent that they were performed, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

150.     PSP has no right to receive payment for any pending bills submitted to GEICO through PSP because, in many cases, the Fraudulent Services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

151.     PSP has no right to receive payment for any pending bills submitted to GEICO through PSP because the Fraudulent Services were: (i) provided by unsupervised MSWs, in contravention of New York law; and/or (ii) provided by individuals who were not employed by PSP.

152.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that PSP has no receive payment for any pending bills submitted to GEICO because: (i) PSP is a healthcare "practice" that was not at the relevant times, under the control and direction of Polino, but rather, was secretly owned, operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the Fraudulent Services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the Fraudulent Services were unnecessary and were performed, to the extent that they were performed, pursuant to predetermined protocols designed solely to financially enrich the

Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the Fraudulent Services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the Fraudulent Services were (a) provided by unsupervised MSWs, in contravention of New York law, and/or (b) provided by individuals who were not employed by PSP.

### SECOND CAUSE OF ACTION
**Against Polino and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

153. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 152 above.

154. PSP is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

155. Polino and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of PSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that PSP was not eligible to receive under the New York no-fault insurance law because: (i) the billed-for-services were provided by a healthcare "practice" that was not at the relevant times, under the control and direction of Polino, but rather, was secretly owned, operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the

Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for-services were unnecessary and were performed, to the extent that they were performed, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed-for-services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for-services were (a) provided by unsupervised MSWs, in contravention of New York law, and/or (b) provided by individuals who were not employed by PSP. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

156. PSP's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Polino and the John Doe Defendants operated PSP, insofar as PSP is not engaged in a legitimate psychology practice and acts of mail fraud therefore are essential for PSP to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the John Doe Defendants continue to be involved in similar fraudulent schemes involving GEICO and other New York automobile insurers and continue to attempt to collect on the fraudulent billing submitted through PSP to the present day.

157. PSP has been and continues to be engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing. These inherently unlawful acts are taken

through PSP in pursuit of inherently unlawful goals – namely, the theft of money from New York automobile insurers through fraudulent no-fault billing.

158.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $790,000.00 pursuant to the fraudulent bills submitted through PSP.

159.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Polino, the John Doe Defendants
and the Social Worker Defendants
(Violation of RICO, 18 U.S.C. § 1962(d))**

160.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 159 above.

161.    PSP is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

162.    Polino, the John Doe Defendants and the Social Worker Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of PSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that PSP was not entitled to receive under the New York no-fault laws because: (i) the billed-for-services were provided by a healthcare "practice" that was not at the relevant times, under the control and direction of Polino, but rather, was secretly owned, operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on

GEICO and other New York automobile insurers; (ii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for-services were unnecessary and were performed, to the extent that they were performed, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed-for-services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for-services were (a) provided by unsupervised MSWs, in contravention of New York law, and/or (b) provided by individuals who were not employed by PSP. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

163.     Polino, the John Doe Defendants and the Social Worker Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

164.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $790,000.00 pursuant to the fraudulent bills submitted through PSP.

165.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against PSP, Polino and the John Doe Defendants**
**(Common Law Fraud)**

166.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 165 above.

167.     Polino, PSP and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of PSP's submission of hundreds of fraudulent charges to GEICO seeking payment for the Fraudulent Services.

168.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)      In every claim, the representation that PSP was legitimately owned and controlled by Polino, when in fact it was owned, operated, controlled and managed by the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

(ii)     In every claim, the representation that the services that were billed were actually provided when in fact they were not;

(iii)    In every claim, the representation that the psychological services were eligible for payment, when in fact they were not because they were performed pursuant to unlawful kickback and/or financial arrangements amongst the Defendants and others;

(iv)     In every claim, the representation that the psychological services were provided by Polino, when in fact the services were provided by independent contractors, unsupervised MSWs and other unlicensed persons; and

(v)      In every claim, the representation that the psychological services were medically necessary when, in fact they were not because they performed and billed pursuant to fraudulent predetermined protocols involving the

dictates of unlicensed persons and designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

169.     Polino, PSP and the John Doe Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through PSP that were not compensable under New York no-fault insurance laws.

170.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $790,000.00 pursuant to the fraudulent bills submitted by Polino, PSP and the John Doe Defendants in the name of PSP.

171.     The extensive fraudulent conduct by Polino PSP and the John Doe Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

172.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
### Against the Social Worker Defendants
### (Aiding and Abetting Fraud)

173.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 172 above.

174.     As set forth herein, the Social Worker Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Polino and the John Doe Defendants using PSP.

175.     The conduct of the Social Worker Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the Social Worker Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Polino, PSP or the John Doe Defendants to obtain payment from GEICO and from other insurers using PSP.

176.     The Social Worker Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to PSP for psychologically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

177.     The conduct of the Social Worker Defendants caused GEICO to pay more than $790,000.00 pursuant to the fraudulent bills submitted through PSP.

178.     The Social Worker Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

179.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against All Defendants**
**(Unjust Enrichment)**

180.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 179 above.

181.     As set forth above, Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

182. When GEICO paid the bills and charges submitted by or on behalf of PSP for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

183. Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

184. Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

185. By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $790,000.00.

## **JURY DEMAND**

186. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A. On the First Cause of Action against PSP, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that PSP have no right to receive payment for any pending bills submitted to GEICO;

B. On the Second Cause of Action against Polino and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $790,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against the Polino, the John Doe Defendants and the Social Worker Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $790,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against PSP, Polino and the John Doe Defendants compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $790,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E. On the Fifth Cause of Action against the Social Worker Defendants compensatory damages in favor of GEICO an amount to be determined at trial but in excess $790,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper; and

F. On the Sixth Cause of Action against all defendants, for more than $790,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper.

Dated: August 30, 2022

RIVKIN RADLER LLP

By: ___/s/ Barry I. Levy, Esq.___
     Barry I. Levy, Esq.
     Michael Vanunu, Esq.
     Allison N. Stapleton, Esq.

926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*